## Lewis N. Shelton *v.* Lemuel N. Baldwin et al.

The act of 1822, (Hutch. Co. 518,) requiring the net proceeds of the sales of runaway slaves to be paid into the county treasury, for the use of the counties, but requiring the county to pay the money to the owner on his proving property in the slave, was not repealed as to the county of Claiborne by the 6th section of the act 1838, declaring that the president and trustees of the Port Gibson Academy shall be entitled to all money arising from the sale of slaves as runaways in said county, but only transferred the right of the county in the money arising from such sale to the said academy.

Any claim that could have been enforced by the owner of a runaway slave against the county of Claiborne, before the passage of said act of 1838, may be enforced against the president and trustees of said academy.

There is no law of the State which says, that a man shall forfeit his right to the net proceeds arising from the sale of his runaway slave.

On appeal from the circuit court of Claiborne county; Hon. Stanhope Posey, judge.

The complainant (Shelton), a citizen of Louisiana, filed his bill on the chancery side of the circuit court of Claiborne county on the 10th of April, 1850, alleging that prior to the 6th of November, 1848, he was the owner of a negro slave named William, which slave had escaped from him in Louisiana, and run away to this State, and was committed to jail in the county of Claiborne. On the 18th of June, 1849, the negro, who had given his name as Edward, was by that name sold out of the jail as a runaway by the sheriff of Claiborne county, for the sum of $680, to James Parson, which sum was paid to the said sheriff. By the act of the legislature of 5th of February, 1838, it was enacted, that the president and trustees of the Port Gibson Academy should be entitled to the proceeds arising from

the sale of any runaway slave sold in said county, for the use of said academy; but no provision is made in said act for the repayment of the proceeds of such sales to the owner of the slave or slaves so sold. That the said sheriff of Claiborne county, after deducting the jail expenses, &c., from the amount for which said slave was sold, paid over to L. N. Baldwin, as trustee or agent of said Port Gibson Academy, the sum of $420, the net proceeds of the money arising from the sale of said slave; which money said Baldwin holds in his hands for the use and benefit of said academy, and refuses to pay over to complainant.

It is further charged by complainant, that he has no remedy for the recovery of said money against the county of Claiborne, or against said president and trustees; and said academy has no visible means, and is insolvent. That one Wm. O'Kelly has a judgment at law against said academy, which it is unable to pay; and he has garnisheed the said $420 in the hands of said Baldwin for the payment of his debt or judgment, which garnishment is now pending, and the money will be applied to O'Kelly's judgment, unless enjoined. He therefore prayed an injunction against Baldwin's paying or parting with the money, and against O'Kelly, and that Baldwin may be declared to hold the money in trust for complainant, and that he be compelled to pay the same over to him.

A demurrer was filed by the defendants to the bill, which was sustained, and the bill dismissed; from which decision of the court, the complainant prayed an appeal to this court.

*H. T. Ellett* for appellant.

There is no law by which the property of the owner of a runaway slave is declared forfeited, except as a penalty for some violation of law. The legislature could not declare such a forfeiture, for private property cannot be taken for public use without just compensation being first made therefor. 13th section of Bill of Rights, Hutch. Code, 40.

The 34th section of the act of 1822 (Hutch. Code, 518) directs that the balance of the proceeds of the sale of a runaway slave, after deducting the sheriff's commissions and fees for making

the sale, paying for apprehending, and all prison fees, and maintenance of said runaway slave whilst in jail, shall be for the use of the county, provided that if the owner of said runaway slave shall, after such sale, prove property in any such slave, the proper county shall pay to him the amount that shall have been paid into the county treasury on account of the sale of said slave. By the act of June 23d, 1824 (Hutch. 531, § 4), the owner is authorized to redeem the slave within six months after the sale, by paying, or offering to pay, all cost and expenses, and per centum thereon.

The 6th section of an act to amend the charter of the Port Gibson Academy, passed February 5, 1838 (McNutt's Code, 812); it is provided that the president and trustees of said Port Gibson Academy shall be entitled to the proceeds arising from the sale of any runaway slave or slaves sold in said county, for the use of said academy. It certainly was not intended to repeal the general law on this subject by this crude and ill-digested amendment of the charter of the academy. There is no good reason for such an act. It was only intended to change the depository of the money in such case from the county to the academy.

This is an implied trust. 2 Story, Eq. § 1255. Relief can be obtained in a court of equity in such a case. Ib. § 1256; 7 Ves. 6; 3 Barb. Ch. R. 218; 2 Term R. 370; 1 Leigh, Ni. Pri. 45.

*W. S. Wilson* and *L. N. Baldwin* for appellee.

The act of 1822 (Hutch. Code, 518, § 34) directed that the proceeds of such sales should be paid into the county treasury, with a proviso, that upon proof of his property by the owner, the money should be refunded to him by the county; and further, that the purchaser's right should remain absolute.

By the act of 1824, Hutch. Dig. 531, the right of redemption of the slave is given to the owner, if it is pursued within six months after the sale.

The act of February 5, 1838, does not provide that the academy shall pay to the owner the proceeds of the sale, which it may have received.

The latter law, by necessary implication, repeals that of 1822; and both laws were passed in the exercise of that general power belonging to governments, of disposing of property which is without an ostensible owner.

In England, by virtue of the regal prerogative, waifs and estrays belonged to the king or his grantee, the absolute property having vested, after proclamation made in the church and two market towns, and the lapse of a year and a day. 1 Black. Com. 298.

In this State, advertisement is made for six months for the owner to appear and reclaim his property. If he does not appear, thirty days notice of the time and place of sale is afterwards to be given. If the time allowed be too short, and the provisions of the law be harsh and rigorous, it is for the legislature to interpose, not this tribunal.

Similar laws have been passed in other States of the Union, thus far, it would seem, without objection to their validity. 2 Kent, Com. 359.

The author last cited tells us, that in New York, and he supposes generally in this country, estrays are disposed of for the use of the poor. So in Massachusetts and New Hampshire. 2 Kent, 359, 360, and notes.

It is difficult to perceive the ground on which the complainant rests his pretensions. He is proceeding to obtain money realized by a sale of his property, and at the same time denies the validity of the sale. He must of course ratify the sale, else he cannot have the money which was brought by it.

The sale must be ratified *in toto*, not in part merely.

Mr. Justice Fisher delivered the opinion of the court.

The complainant filed his bill on the chancery side of the circuit court of Claiborne county, to recover of the appellees, as trustees of the Port Gibson Academy, the sum of four hundred and twenty dollars, being the amount of money, after paying all charges arising from the sale of a slave, the property of the complainant, sold as a runaway by the sheriff of said county, in accordance with the provisions of the statute on the subject.

The appellees demurred to the bill, and the court below sustained the demurrer; from which decree the cause is brought into this court by appeal.

The counsel for the appellees insists, that, by the 6th section of the act of 1838, the money is given absolutely to the president and trustees of the academy. On the contrary, it is argued on behalf of the complainant, that he is entitled, by virtue of the 34th section of the act of 1822, Hutch. Code, 518; to recover the money, notwithstanding the provision contained in the 6th section of the act of 1838, McNutt's Code, 813.

The question for our consideration under these statutes, is, whether the act of 1822, requiring the net proceeds of the sale of a runaway slave to be paid into the county treasury for the use of the county, but requiring the county to pay the money to the owner on his proving his property in the slave, has been repealed, so far as the county of Claiborne is concerned, by the 6th section of the act of 1838, declaring that the president and trustees of the said academy shall be entitled to all money arising from the sale of slaves sold as runaways in said county.

The general law of the State recognizes the owner's right to the net balance of money, after defraying all expenses for apprehending, maintaining, and selling the slave. This right is certainly recognized, so far as we are advised, by the law in every county in the State, with the single exception of the county of Claiborne; and, in our opinion, under a fair interpretation of the law, that county does not constitute an exception. Under the act of 1822, the county was entitled to the use of the money till the owner established his right to it, by proving his property in the slave sold as a runaway. Did the statute of 1838 transfer merely the right of the county in the money to the academy, or did it transfer the right both of the county and the owner of the slave? If the latter, then the act of 1822 is entirely repealed, so far as the county of Claiborne is concerned. If the former, it is only repealed so far as the rights of the county may be affected. We are inclined to the opinion, that the act must be construed to affect only the right of the county, and not the right of the owner of the slave. There is

nothing in the act expressly repealing the former law; and it is a familiar rule, that a statute is not repealed by implication by a subsequent statute on the same subject, unless the two laws are so inconsistent with each other, that they cannot stand together. The presumption is not to be indulged, that a law seriously affecting private rights would be enacted for a single county, leaving the general law, guarding and sustaining these rights, in full force as to all other counties in the State. The right of the county was a fair and legitimate subject for legislation, which might be transferred to the academy without departing from the just and salutary policy of the State, in recognizing the title of the owner of the slave to the money, upon his complying with the requisitions of the law

We are therefore of opinion, that the act of 1838 only gave to the academy such right and title as the county of Claiborne, under the act of 1822, had in the money; and that the claim of the complainant ought to be enforced to the same extent against the president and trustees of the academy, as it could have been enforced against the county of Claiborne, if this act of 1838 had not been enacted. Whether this view of the law is entirely free from doubt, we will not undertake to say. It fully accords with those principles of justice which must force the approbation of every rightly constituted mind. The act of 1822 is founded in a just and a wise policy. The act of 1838, if interpreted as contended on behalf of the academy, would be palpably unjust; and the question therefore arises, Whether a law, which is just and equitable in its provisions, shall be considered as repealed by a subsequent law of doubtful meaning, and not expressly repealing the previous law. One construction makes the law harmonize with the policy of the State, and with the acknowledged principles of equity; the other construction makes the law violate this policy, as well as shock the conscience and moral sense of every man who hears the proposition stated.

There is no law of the State which declares that a man shall forfeit his right to the net proceeds arising from the sale of his runaway slave. On the contrary, the whole legislation on this subject has looked to the protection of this right. The law

Shelton *v.* Baldwin et al.

requiring the runaway to be apprehended, secured in jail, and finally sold if not claimed by the owner, has its origin in necessity, as a police regulation.   As such it is wise and salutary, in the protection which it affords to the community against the depredations which may be committed by this class of our population, when released from the necessary restraint and government of the master.   As a police regulation, the law ought to be liberally construed for the accomplishment of the desired end, which was the protection of the community on the one hand, and the rights of the master on the other.   When the slave has been sold by the sheriff out of jail, the law has performed its office as a police regulation.   The former owner is charged with all the costs, from the apprehension to the final disposition of the slave.   The law, having thus performed its office as a police regulation, looks alone to the disposition of the balance of the money.   The county has the use of it till the owner of the slave shall establish his right to it.   The county is the trustee of the owner, and must perform the trust when the owner shall prove his title to the slave.   This is the general law of the State.   The president and trustees of the Port Gibson Academy succeeding to the rights of the county of Claiborne in the money, ought in equity to be required to perform the trust, by the former law required of the county. It is true there is no express provision of the law requiring them to pay the money to the owner of the slave.   But taking the money, and having the use of it, that is to say, all the interest which it may yield, they ought to do what the law required the county to do before the act of 1838.   If there is nothing in the law requiring them to perform this duty, equity, after ascertaining that there is a clear right, will supply the remedy.   The right is clear, because it is expressly recognized by the law; and this law, as we have seen, is not repealed by any thing, either expressed or necessarily implied, in the subsequent law.

Decree reversed, demurrer overruled, and cause remanded.